**MOUNT AIRY LODGE, INC.**

v.

**The UPJOHN COMPANY.**

**Civ. A. No. 79–4658.**

United States District Court,
E.D. Pennsylvania.

Nov. 19, 1982.

---

Patrick J. O'Connor, Cozen, Begier & O'Connor, Philadelphia, Pa., James L. Fetterly, Maslon, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for plaintiff.

Richard P. Brown, Jr., David L. Harbaugh, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendant.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

On October 28, 1982, after a long trial, I committed this diversity products-liability case to the nine-person jury. I instructed the jury on three theories of liability: negligence, strict liability, and misrepresentation. In addition, I gave the jury thirteen special interrogatories which I explained in my charge and upon which I elaborated in a covering memorandum.

After brief deliberations on October 28, the jury recessed until the following morning. In the course of that day, the jury asked two questions; I responded to them in court with counsel present. In mid-afternoon the jury returned with answers to the special interrogatories.[1]

The jury's answers found the defendant negligent, found the defendant's product in a defective condition at the time of sale, and found that the defendant had made misrepresentations to the public, including the plaintiff, about the character or quality of its product.[2] The jury's answers also found, however, that neither the negligence nor the defectiveness was a substantial factor in causing plaintiff's loss, and that the misrepresentations did not influence plaintiff's decision to buy the defendant's product.[3] Taken together, the last three answers negated liability on all of plaintiff's potential theories of liability. The following colloquy then took place:

> The Court: All right. So you did not go any farther [than interrogatory 10].
>
> Foreman: That's right.
>
> The Court: Is that correct?
>
> Foreman: That's correct.

I then asked each juror whether the answers reported by the foreman were her/his answers. Each juror answered in the affirmative. I thanked the jury members and dismissed them. After the jurors left the

---

1. The covering memorandum, the interrogatories and the jury's written answers to the interrogatories are attached hereto as Appendix A.

2. Interrogatories 1, 6, and 9.

3. Interrogatories 2, 7, and 10.

courtroom, I stated that judgment would be entered in favor of the defendant.

Approximately one-half hour later, plaintiff's chief trial counsel—Messrs. Fetterly and O'Connor—returned to the courtroom where I was hearing another matter. During a recess, Messrs. Fetterly and O'Connor advised me that a few minutes earlier: (1) two jurors—jurors 3 and 4—had approached Mr. Fetterly outside the courthouse and congratulated him on plaintiff's victory, after which (2) Mr. Fetterly's conversation with the two jurors was enlarged to include Mr. O'Connor in whose presence the two jurors reiterated their understanding that the jury had reached a verdict under which plaintiff was to recover $973,000.[4]

I asked Messrs. Fetterly and O'Connor to advise Mr. Harbaugh, of defense counsel, that a matter had arisen with respect to which I would appreciate his returning to court. Shortly thereafter, a conference was held in chambers: Messrs. Fetterly and O'Connor represented plaintiff and Messrs. Harbaugh, Kittredge and Lewis represented defendant. During that conference, which was on the record, Messrs. Fetterly and O'Connor repeated the substance of their conversations with jurors 3 and 4. Counsel and I also examined the written interrogatory answers. Notwithstanding that the foreman had in court affirmed that the jury had not gone beyond interrogatory 10, we discovered that interrogatory 13 had been answered. (Interrogatory 13 answered "No" with respect to plaintiff's entitlement to, and "0" with respect to the amount of, punitive damages; interrogatory 10 was the last causation interrogatory.)

Relying on (1) what jurors 3 and 4 said to plaintiff's counsel, and (2) the arguable inaccuracy of the foreman's in-court affirma-

tion that the jury had not proceeded beyond interrogatory 10, plaintiff's counsel asked me to interview the two jurors who had approached Mr. Fetterly and also to reconvene the entire jury panel. Defense counsel objected, citing Federal Rule of Evidence 606(b). I declined to act on either of plaintiff's counsel's requests at that time, asking instead that the parties brief the issues. I then met with the two jurors and cautioned them not to discuss the matter with their fellow jurors or with counsel until they heard further from this court.

Briefs on the plaintiff's motion to reconvene the jury were filed on November 3. Reply briefs were filed on November 5. Argument was had on November 10.

Two questions are presented to the court—questions the resolution of which, so plaintiff contends, calls for reassembling and interrogating the jury. The first of the two questions is whether the jury's recorded answers to the special interrogatories are irreconcilably inconsistent. The second is whether one or more of the jury's recorded answers to interrogatories, as reported to the court orally and on paper, is/are not the answer(s) actually voted by the jury. If either of the two questions is answered by the court in the affirmative—so plaintiff argues in its most recent submission (letter of November 11, 1982, from Patrick J. O'Connor, Esq.)—the jury should be reinstructed and directed to deliberate further or a new trial should be ordered.

Defendant contends that since the jury has been discharged, any interrogation of a juror now is barred by Rule 606(b).[5] Defendant further contends that there is an interpretation of the jury's written answers to the interrogatories that is internally consistent.[6] And defendant submits that as a

---

4. $973,000 was the figure to which the parties had stipulated as being plaintiff's actual loss if compensatory damages were to be awarded; interrogatory 12 as submitted to the jury contained the figure $973,000 in the blank in which an answer would be inscribed.

5. The literature with respect to post-verdict interrogation of jurors is substantial. For recent and thoughtful case discussion of Rule 606(b),

see *Brewer v. Jeep Corp.*, 546 F.Supp. 1147 (W.D.Ark.1982); *McNulty v. Borden*, 542 F.Supp. 655 (E.D.Pa.), *appeal dismissed,* No. 82–1457 (3d Cir. Oct. 19, 1982).

6. Under that interpretation: The jury would be understood (1) to have treated interrogatory 12—where it made no notations—not as an assessment of damages against defendant in the sum of $973,000 but simply as a statement

matter of law a plausible consistent interpretation must be preferred to any number of equally or even more plausible inconsistent interpretations.

On this last proposition, defendant appears to be right; indeed, the Seventh Amendment is said to compel the rule. *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir.1973). But to attribute consistency to the jury's written answers one must proceed from the assumption that those written answers are the answers the jury voted and directed the foreman to report. That there is a very strong basis for such an assumption is manifest—namely, that each juror in open court expressed her/his agreement with the answers read by the foreman, which answers negatived liability on each of the three theories propounded. The only factors cutting somewhat against the assumption that the answers were accurately recorded are (1) the hearsay statements of jurors 3 and 4, and (2) the fact that the foreman's written answers include a form of answer (not reported orally by the foreman in open court) to interrogatory 13, although the jury had been instructed in my charge and by the covering memorandum not to proceed to interrogatories 12 and 13 unless it had found liability on at least one of the three proposed theories of liability.[7]

Defendant, in addition to being unpersuaded that there is any uncertainty about the accuracy of the recorded interrogatory answers, insists that, even if there be any measurable uncertainty, interrogation of jurors to resolve the matter is foreclosed by Rule 606(b) since such testimony would enter the forbidden area of impeachment of the verdict. But defendant's reading of Rule 606(b) is a shade too broad. The Rule "would not bar testimony by a juror that all the jurors agree that through inadvertence, oversight or mistake the verdict announced was not the verdict on which agreement had been reached." 3 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 606[04] at 606–32 (1981).

Accordingly, I conclude that, in view of the brooding (albeit narrow) uncertainty which I perceive, there is ground for recalling jurors 3 and 4 and the foreman to be interviewed by me. In such interview(s) I will ask one or more of them—individually and *in camera*,[8] but on the record—such questions as will help me determine (1) whether there is prima facie evidence for supposing that all nine of the jurors would, if recalled, agree that there has been a "mistake" in reporting any jury answer, and (2) whether such mistake(s), if found to exist, would undercut the preclusion of liability reflected in the answers reported in court.

## APPENDIX

October 29, 1982

Memorandum to the Jury

Re: *Attached Interrogatories*

When you have completed your deliberations, you will record on the attached interrogatories your unanimous answers. Those answers will constitute your decision in this case. When you have finished recording your answers to the interrogatories, you will inform me, via the marshal, that you have reached a verdict. I will then so ad-

---

agreed upon by the parties, and to which the jury took no exception, that plaintiff's aggregate loss due to fire was $973,000; and (2) to have answered "No" and "0" to interrogatory 13 as reflecting its recognition that no punitive damages were proper where no liability had been found.

7. The weight of these instructions is in some measure undercut by the fact that the interrogatory form itself directed the jury, if it answered "No" to interrogatory 10, to go on to interrogatory 12, which in turn directed the jury to interrogatory 13.

8. The interviewing will be in chambers. When I have completed such questioning as I think sufficient with respect to a particular juror, the reporter and I will come into the courtroom and the reporter will read the questions and answers to counsel. This will enable counsel to have the opportunity to request that I put additional questions to the interviewee before releasing him. If I decline to pursue such a request, I will so advise counsel on the record at that time.

vise the attorneys. As soon as the attorneys and I are in the courtroom, you will come in, bringing the attached interrogatories, and your answers to the interrogatories will be read out loud.

Interrogatories 1 through 11 ask you to make findings about each of the three separate—alternative—theories of liability (Negligence; Strict Liability; and Misrepresentation) presented by plaintiff in this case. Interrogatories 12 and 13 ask you to make findings about damages. You will not answer the damages interrogatories unless you find the defendant liable to the plaintiff on at least one of the three theories of liability. Specifically, this means that you should answer the damages interrogatories if, but only if:

1) You have answered "NO" to interrogatory 3 or 4; *or*

2) In answering interrogatory 5 you have attributed to plaintiff an amount of negligence less than 51 per cent; *or*

3) You have answered "NO" to interrogatory 8; *or*

4) You have answered "YES" to interrogatory 11.

---

Louis H. Pollak

### INTERROGATORIES

#### NEGLIGENCE

1. Was the defendant negligent in failing to exercise reasonable care so as to adequately warn the plaintiff, before the date of the fire at Mount Airy Lodge, of the dangers and risks of harm associated with using the defendant's polyurethane foam insulation?

   <u>X</u>  YES

   _____  NO

(If your answer to No. 1 is yes, go on to No. 2)

(If your answer to No. 1 is no, go on to No. 6)

2. Was the defendant's negligence a substantial factor in bringing about the property damage and other losses sustained by the plaintiff?

   _____  YES

   <u>X</u>  NO

(If your answer to No. 2 is yes, go on to No. 3)

(If your answer to No. 2 is no, go on to No. 6)

3. Was the plaintiff negligent in subjecting its property to unreasonable and unforeseeable risks of harm in connection with its use of the defendant's polyurethane foam insulation?

   _____  YES

   _____  NO

. (If your answer to No. 3 is yes, go on to No. 4)

(If your answer to No. 3 is no, go on to No. 6)

4. Was the plaintiff's negligence a substantial factor in bringing about the property damage and other losses sustained by the plaintiff?

   _____  YES

   _____  NO

(If your answer to No. 4 is yes, go on to No. 5)

(If your answer to No. 4 is no, go on to No. 6)

5. (ANSWER ONLY IF YOUR ANSWERS TO NO. 3 AND NO. 4 ARE "YES")

Taking the combined negligence that was a substantial factor in bringing about the property damage and other losses sustained by the plaintiff as 100 percent, state in percentages the amount of negligence attributable to the plaintiff and to the defendant:

Plaintiff _____ percent

Defendant _____ percent

(Go on to No. 6)

#### STRICT LIABILITY

6. At the time of sale to the plaintiff, was the defendant's polyurethane foam insulation in a defective condition in failing to be equipped with adequate warnings about the dangers and risks associated with using the defendant's product?

   <u>X</u>  YES

   _____  NO

(If your answer to No. 6 is yes, go on to No. 7)

(If your answer to No. 6 is no, go on to No. 9)

7. Was the defective condition of the defendant's polyurethane foam insulation a substantial factor in bringing about the property damage and other losses sustained by the plaintiff?

   _____  YES

   <u>X</u>  NO

(If your answer to No. 7 is yes, go on to No. 8)

(If your answer to No. 7 is no, go on to No. 9)

8. Did the plaintiff actually know and fully appreciate the nature and extent of the dangers associated with the defendant's polyurethane foam insulation and, despite having such an understanding, willingly choose to undertake the risks of using the defendant's product?

   _____  YES .

   _____  NO

(Go on to No. 9)

#### MISREPRESENTATION

9. Did the defendant make misrepresentations to the public, including the plaintiff, about the character or quality of its polyurethane foam insulation which the

average consumer would consider important in deciding whether to buy the defendant's product?

   **X** YES

   ——— NO

(If your answer to No. 9 is yes, go to No. 10)

(If your answer to No. 9 is no, go to No. 12)

10. Did the defendant's misrepresentations influence the plaintiff in its decision to buy the defendant's product?

   ——— YES

   **X** NO

(If your answer to No. 10 is yes, go to No. 11)

(If your answer to No. 10 is no, go to No. 12)

11. Was the plaintiff's reliance upon the defendant's misrepresentations a substantial factor in bringing about the property damage and other losses sustained by the plaintiff?

   ——— YES

   ——— NO

(Go on to No. 12)

COMPENSATORY DAMAGES

12. State the amount of the property damage to the plaintiff's laundry building, machinery and equipment, the amount of the plaintiff's losses resulting from the damage to its towels, sheets, bedding and other linens, and the amount of the losses sustained by the plaintiff as a result of the interruption of its business, which were caused by the fire at Mount Airy Lodge.

$973,000

(Go to No. 13)

PUNITIVE DAMAGES

13. (a) Do you find that the plaintiff is entitled to punitive damages?

   ——— YES

   **X** NO

(b) If your answer to No. 13(a) is yes, state the amount.

$ – 0 –